**K&L GATES LLP**

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001

*Attorneys for Plaintiffs*
  *Hudson Hospital OPCO, LLC, d/b/a CarePoint Health—Christ Hospital; IJKG,*
  *LLC, IJKG PROPCO LLC and IJKG OPCO LLC, d/b/a CarePoint Health—*
  *Bayonne Medical Center; and HUMC OPCO LLC, d/b/a CarePoint Health—*
  *Hoboken University Medical Center*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HUDSON HOSPITAL OPCO, LLC—d/b/a CAREPOINT HEALTH—CHRIST HOSPITAL, IJKG, LLC; IJKG PROPCO LLC and IJKG OPCO LLC d/b/a CAREPOINT HEALTH—BAYONNE MEDICAL CENTER; and HUMC OPCO LLC d/b/a CAREPOINT HEALTH— HOBOKEN UNIVERSITY MEDICAL CENTER, | Hon. _____, U.S.D.J. <br><br> Hon. _____, U.S.M.J. <br><br> Civil Action No. |
| Plaintiffs, | |
| v. | **COMPLAINT AND JURY DEMAND** |
| AETNA HEALTH INC. and AETNA LIFE INSURANCE CO., | |
| Defendants. | |

For their Complaint against Defendants, Aetna Health Inc. ("Aetna Health") and Aetna Life Insurance Company ("Aetna Life") (collectively, "Defendants" or Aetna"), Plaintiffs Hudson Hospital OPCO, LLC d/b/a CarePoint Health—Christ Hospital ("Christ Hospital"), IJKG, LLC, PROPCO LLC and IJKG OPCO LLC d/b/a CarePoint Health—Bayonne Medical Center ("BMC"), and HUMC OPCO LLC d/b/a CarePoint Health—Hoboken University Medical Center ("HUMC"), (collectively, the "CarePoint Hospitals"), by and through their attorneys, K&L Gates LLP, hereby allege as follows:

## INTRODUCTION

1.     This is an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and state law, based on Defendants' failure and ongoing refusal to pay in full for health care services, including services related to COVID-19, that the CarePoint Hospitals provided to patients covered by the Plans provided or administered by Defendants' ("Defendants' Subscribers" or "Aetna's Subscribers").

2.     Plaintiffs are local, hospital-based, emergency medical care providers. As emergency medical care providers, the Plaintiffs are essential workers on the front lines of the patient emergencies and, importantly, pandemic response.

3.     Plaintiffs' claims arise in part from Defendants' intentional and unlawful pattern of drastically underpaying and/or refusing to pay the CarePoint

Hospitals, which were out-of-network with Defendants before August 1, 2021, for claims submitted to Defendants for medical treatment provided to patients.

4.     Aetna provides health care insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of health care benefit plans and policies of insurance, including employer-sponsored benefit plans and individual health benefit plans ("Aetna Plans").

5.     As shown further below, in violation of their duties under ERISA and state law, Defendants have failed and refused to pay in full for health care services that the CarePoint Hospitals provided to Defendants' Subscribers.

6.     During the period from approximately March 15, 2016, through July 31, 2021 ("the Claim Period"), the CarePoint Hospitals provided hospital services in connection with 18,652 patient visits by Defendant's Subscribers.

7.     For 9,910 patient visits by Defendants' Subscribers, Aetna either did not pay or underpaid for hospital services provided by the CarePoint Hospitals (the "Underpaid Claims") during the Claim Period as follows:

a.     During the Claim Period, Christ Hospital provided hospital services relating to approximately 3,209 patient visits by Aetna Subscribers.  Of those patient visits:  1,969 were for emergency/urgent care; and 1,240 were for non-emergency/non-urgent ("Elective") care within the scope of the out-of-network benefits provided under the patients' Plans.

b.     During the Claim Period, BMC provided hospital services relating to approximately 2,722 patient visits by Aetna Subscribers.  Of those patient visits:  1,604 were for emergency/urgent care; and 1,118 were for Elective care within the scope of the out-of-network benefits provided under the patients' Plans.

c.     During the Claim Period, HUMC provided hospital services relating to approximately 3,979 patient visits by Aetna Subscribers.  Of those patient visits:  2,704 were for emergency/urgent care; and 1,275 were for Elective care within the scope of the out-of-network benefits provided under the patients' Plans.

8.     The CarePoint Hospitals' billed charges for the Underpaid Claims during the Claim Period total approximately $328,499,271, reflecting the CarePoint Hospitals' usual and customary rates for the particular medical services provided, but Aetna underpaid each of these claims.

9.     Assuming an average patient responsibility (*i.e.*, copayments, coinsurance, and deductibles) under the applicable Plans of ten percent (10%) of the charges for emergency/urgent care and thirty-percent (30%) of the charges for Elective care, Aetna is responsible for $237,263,774 and $45,410,999 of the total underpaid charges, respectively; the grand total of Aetna's responsibility for the Underpaid Claims is $282,674,773.

10.     However, to date, Aetna has paid the CarePoint Hospitals for only a portion of its responsibility for the Underpaid Claims - $101,275,736.  The current unpaid balance due to the CarePoint Hospitals by Aetna is at least $181,399,037 with respect to the Underpaid Claims.

11.     Defendants' denials and underpayments to the CarePoint Hospitals on the Underpaid Claims is in clear violation of the terms of the Plans, as well as federal and state law.

12.     For example, the CarePoint Hospitals, like all hospitals, are prohibited by the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), 42 U.S.C. § 1395dd, from turning away women who are in active labor or any other persons in need of emergent/urgent medical treatment because of inability to pay or unavailability of insurance.

### THE PARTIES

13.     BMC is a privately held, limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 29th Street and Avenue E, Bayonne, New Jersey.

14.     Christ Hospital is a privately held, limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 176 Palisade Avenue, Jersey City, NJ 07306.

15.     HUMC is a privately held, limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 308 Willow Avenue, Hoboken, NJ 07030.

16.     Aetna Health is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 151 Farmington Avenue, RW61, Hartford, Connecticut, 06156.

17.     Aetna Health is in the business of underwriting, selling, and administering health benefit plans and policies of health insurance.  Aetna Health provides benefits under a variety of health benefit plans, including individual health benefit plans and group plans, including employer-sponsored plans.

18.     Aetna Life is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 151 Farmington Avenue, RW61, Hartford, Connecticut, 06156.

19.     Aetna Life is in the business of underwriting, selling, and administering health benefit plans and policies of health insurance.  Aetna Life provides benefits under a variety of health benefit plans, including individual health benefit plans and group plans, including employer-sponsored plans.

## JURISDICTION AND VENUE

20.     This Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the CarePoint Hospitals assert federal claims against Defendants, in Counts One, Two, and Three, under ERISA.

21.     This Court also has supplemental jurisdiction over the CarePoint Hospitals' state law claims against Defendants, in Counts Four through Eight, because these claims are so related to the CarePoint Hospitals' federal claims that the state law claims form a part of the same case or controversy under Article III of the Aetna States Constitution.  The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

22.     This Court has personal jurisdiction over Aetna because Aetna carries on one or more businesses or business ventures in this judicial district; there is the requisite nexus between the business(es) and this action; and Aetna engages in substantial and not isolated activity within this judicial district.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial portion of the events giving rise to this action arose in this District.

## FACTUAL ALLEGATIONS

### A.      The CarePoint Hospitals

24.      BMC is a 244-bed, fully accredited, acute care hospital that provides quality, comprehensive, community-based health care services to more than 70,000 people annually.  The hospital includes a comprehensive inpatient and outpatient programs in such areas as: cardiology, medical and radiation oncology, emergency services, diagnostic laboratory, radiology, surgery, senior services, psychiatric and more. The facilities include 205 medical/surgical beds, 10 obstetrical beds, 14 adult ICU/CCU beds, and 15 adult, acute open psychiatric beds. The Emergency Department includes 23 full-service emergency room bays.   The service complement consists of 6 inpatient operating rooms, 2 cystoscopy rooms,  full-service cardiac catheterization lab, full-service vascular lab, Vein Institute, Acute Dialysis service, 1 MRI unit, emergency angioplasty services, elective angioplasty, 2 hyperbaric chamber units, Linear Accelerator and a PET-CT diagnostic imaging unit.

25.      Christ Hospital is a 349-bed fully accredited acute care hospital.  With a highly-qualified medical team — including more than 500 doctors with specialties ranging from allergies to vascular surgery — Christ Hospital offers a full spectrum of services and has been recognized for excellence in cardiovascular, neuroscience, respiratory, and medical/surgical care.  As a state-certified and Joint

Commission Accredited Stroke Center and Primary Angioplasty Center, Christ Hospital provides lifesaving emergency interventions with outcomes that rank among the best in New Jersey. Christ Hospital is affiliated by common ownership with the principal owners of BMC and HUMC.

26. HUMC is a 333-bed fully accredited general acute care hospital. HUMC provides advanced medical technologies in support of its medical staff, nursing team, and other caregivers, to enable state-of-the-art care to citizens of Hoboken and the surrounding communities. HUMC offers excellence in emergency medicine in the 34-bay emergency room and the dedicated OB/GYN ED; inpatient rehabilitation; transitional care; child and adult behavioral health; women's care; wound care; and numerous surgical subspecialties. The American Heart and Stroke Association awarded the Silver Award to HUMC for its dedication to improving quality of care for stroke patients. Overall, HUMC was ranked in the top ten hospitals in New Jersey for care quality among all hospitals in the state with 350 beds or fewer. HUMC is affiliated by common ownership with the principal owners of BMC and Christ Hospital.

27. Between 2008 and 2012, each of the CarePoint Hospitals was purchased out of bankruptcy. The owners then invested substantial time, effort and capital into improving the hospitals' finances, physical plant, equipment, and overall quality of the healthcare services they provide. Setting aside the

immeasurable benefit of improved health care for the patient communities, the new owners' efforts to rescue these hospitals from bankruptcy have generated huge economic benefits to Hudson County and the State of New Jersey.

28.    During the Claim Period, the CarePoint Hospitals operated as for-profit hospitals and, as such, were not eligible for tax exempt status as charitable organizations.

29.    Also during the Claim Period, the CarePoint Hospitals received no federal or state government payments for patients who are undocumented aliens, the vast majority of whom are treated at urban hospitals.  The hospitals may be able to obtain partial payment for undocumented patients who agree to file a charity application, but many resist out of fear of deportation.

30.    During the Claim Period, the CarePoint Hospitals were also paid far less than their costs for services provided to Medicare, Medicaid and Charity Care patients.

31.    Moreover, during the Claim Period, the CarePoint Hospitals continued to rank very high in the State of New Jersey in charity care as a percentage of total care provided.  This data also reflected that the CarePoint Health System was the largest Charity Care provider in Hudson County.

32.    The CarePoint Hospitals and the independent physicians attending to patients at the hospitals are required by law to provide emergency/urgent care to

any patient regardless of the patient's ability to pay and regardless of source of insurance payment.  A patient's ability to pay has never affected or impeded the CarePoint Hospitals' delivery of emergency health care.

> **B.    The CarePoint Hospitals' Out-of-Network Status Through July 31, 2021**

33.    Health care providers are either "in-network" or "out-of-network" with respect to insurance carriers.  "In-network" or "participating" providers are those who contract with health insurers that require them to accept discounted negotiated rates as payment in full for covered services.

34.    "Out-of-network" or "non-participating" providers are those that do not have contracts with insurance carriers to accept discounted rates and instead set their own fees for services based on a percentage of charges.

35.    New Jersey law does not specify how a hospital's out-of-network charges must be determined.  Rather, under New Jersey law, hospitals are permitted to set charges for various services and products as they see fit.  *N.J.S.A.* 26:2H-18.51.  Moreover, courts lack authority to review and adjust a hospital's set charges under New Jersey law.  *DiCarlo v. St. Mary Hospital*, 530 F.3d 255 (3d Cir. 2008); *Matter of Final Agency Decision by New Jersey Dep't of Health Regarding Utilization and Quality Review for Calendar Year 1993*, 273 N.J. Super. 205, 226 (App. Div. 1994).

36.     Notably, all three of the CarePoint Hospitals were previously forced to seek bankruptcy protection because of inadequate in-network arrangements. BMC, HUMC, and Christ Hospital were purchased out of bankruptcy by their then owners in 2008, 2011 and 2012, respectively.

37.     After being purchased out of bankruptcy, each of the CarePoint Hospitals was an out-of-network provider until August 1, 2021, when the CarePoint Hospitals entered into three separate Hospital Agreements and became in-network with Aetna.

**C.     The CarePoint Hospitals' Out-of-Network Status Was Well Known to Patients and the Public**

38.     During the Claim Period, the CarePoint Hospitals prominently advised their patients and the public of their out-of-network status.  The hospitals' websites directed, and continue to direct, patients to a webpage that lists the insurers with whom the hospitals are in-network and explains the difference between in-network and out-of-network providers, and how the hospitals bill insurers and patients.

39.     The CarePoint Hospitals' Insurance Help Desks were at all relevant times, and remain, available to answer questions from patients and their billing department was, and is, available to explain and review a patient's bill, and discuss payment options**.**

40.     The CarePoint Hospitals also directed, and continue to direct, patients to contact their carrier to understand their out-of-network benefits.

**D.     During the Claim Period, Aetna Subscribers Sought and obtained Emergency Medical Treatment from the CarePoint Hospitals**

41.     As noted above, Plaintiffs were out-of-network with Aetna during the Claim Period.

42.     Notwithstanding the CarePoint Hospitals' out-of-network status with respect to Aetna during the Claim Period, Aetna Subscribers received treatment from the CarePoint Hospitals' emergency departments.

43.     Importantly, federal and New Jersey law obligate Plaintiffs, as emergency medical providers, to provide treatment to all patients who present at emergency departments. 42 U.S.C. § 1395dd; *N.J.S.A.* 26:2H-18.64.

44.     Among other things, EMTALA, and similar provisions of New Jersey laws and regulations, mandate that hospitals and the physicians that staff hospital emergency departments have a duty to provide an appropriate medical screening examination to all individuals who come to an emergency department with what they believe to be an emergent or urgent condition. 42 U.S.C. § 1395dd(a); *N.J.S.A.* 26:2H-18.64; *N.J.A.C.* 8:43G-12.7(c).

45.     If it is determined that an emergency medical condition exists, the patient must be evaluated by a physician and, with certain limited exceptions, provided such medical treatment as is necessary to assure that the condition has

been stabilized. 42 U.S.C. § 1395dd(b), (c); *N.J.A.C.* 8:43G-12.7(d), (e).

46.    If it is determined that an emergency does not exist, the patient shall either be treated in the emergency department or referred to an appropriate health care provider, and be given appropriate discharge instructions. *N.J.A.C.* 8:43G-12.7(f), (n).

47.    New Jersey regulations make clear that no patient who comes to a hospital emergency department shall be discharged to home or another facility without being seen and evaluated by qualified medical personnel, which must occur within four hours of the patient's coming to the emergency department. *N.J.A.C.* 8:43G-12.7(g).

48.    EMTALA and New Jersey law subject emergency department physicians to civil liability for violations.  For example, "any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital" who negligently violates EMTALA is subject to civil monetary penalties of up to $50,000 per violation. 42 U.S.C. §1395dd(d)(1)(B).

49.    There are no exceptions to the emergency medicine providers' legal obligation to render services based on a patient's ability to pay or the presence of health insurance.  Notably, *N.J.S.A.* 26:2H-18.64 provides that "[n]o hospital shall deny any admission or appropriate services to a patient on the basis of that patient's ability to pay or source of payment."  A patient's ability to pay in no way affects or

impedes the delivery of emergency care by Plaintiffs or the hospitals they staff.

**E.    With Plaintiffs' Duty to Treat Aetna Subscribers Comes Aetna's Concomitant Duty to Pay Plaintiffs a Reasonable Rate for Out-of-Network Emergency Services**

50.    Because emergency medical providers have no discretion to turn patients away, and must treat all patients, regardless of ability to pay, they depend on commercial insurance companies to meet their legal responsibility and timely and properly pay a reasonable rate to providers such as Plaintiffs who are not "in-network" and are not "participating" providers.

51.    The duty of healthcare insurers to pay a reasonable rate to out-of-network providers for the treatment they are required to provide to those insurers' subscribers derives not only from principles of fundamental fairness and equity, but also from multiple sources of state and federal law.

### 1. *New Jersey's Prompt Payment Requirements*

52.    For example, in processing Aetna's claims, Aetna is governed by the prompt payment requirements of the New Jersey Health Claims Authorization, Processing and Payment Act ("HCAPPA").

53.    HCAPPA's requirements are codified in various sections of the New Jersey Statutes, including, as applicable to Aetna, *N.J.S.A.* 17B:26-9.1 (applicable to health insurance other than group and blanket insurance), *N.J.S.A.* 17B:27-44.2 (applicable to group health and blanket insurance), and *N.J.S.A.* 26:2J-8.1(d)(9)

(applicable to health maintenance organizations).   Regardless of the nature of the payor and type of insurance, however, HCAPPA's prompt payment requirements are the same.

54.    Under HCAPPA, the insurance carrier must acknowledge receipt of all claims, both emergent and non-emergent, within two working days. *See N.J.S.A.* 17B:26-9.1(d)(5); *N.J.S.A.* 17B:27-44.2(d)(5) and *N.J.S.A.* 26:2J-8.1(d)(5).

55.    HCAPPA further requires insurance carriers to pay claims within 30 days after the insurance carrier receives the claim when submitted electronically, or 40 days if received non- electronically, provided the following conditions apply:

  a.  the healthcare provider is eligible at the date of service;

  b.  the person who receives the healthcare service is covered on the date of service;

  c.  the claim is for a service or supply covered under the health benefits plan;

  d.  the claim is submitted with all the information requested by the payer on the claim form or in other instructions that is distributed in advance to the healthcare provider or covered person in accordance with the provisions of section 4 of P.L.2005, c. 352 (C.17B:30-51); and

  e.  the payer has no reason to believe that the claim has been submitted fraudulently.

*N.J.S.A.* 17B:26-9.1(d)(1), 17B:27-44.2(d)(1) and *N.J.S.A.* 26:2J-8.1(d)(1).

56.    In addition, HCAPPA requires that, if all or a portion of the claim is not paid within the statutory timeframe for one or more statutorily enumerated

reasons, the payer shall notify the health care provider and covered person in writing within 30 days of receipt of an electronic claim, or within 40 days of receipt of a claim submitted by other than electronic means, that: (i) the claim is incomplete with a statement as to what substantiating documentation is required for adjudication of the claim; (ii) the claim contains incorrect information with a statement as to what information must be corrected for the adjudication of the claim; (iii) the payer disputes the amount claimed in whole or in part with a statement as to the basis of that dispute; or (iv) the payer finds there is strong evidence of fraud and has initiated an investigation into the suspected fraud in accordance with its fraud prevention plan or referred the claim, together with supporting documentation, to the Office of the Insurance Fraud Prosecutor. *N.J.S.A.* 17B:26-9.1(d)(2); *N.J.S.A.* 17B:27-44.2(d)(2).

57.      Moreover, under HCAPPA, an insurance carrier's dispute of a portion of the claim does not excuse the carrier from payment of the entire claim: "Any portion of a claim that meets the criteria established in paragraph (1) of this subsection shall be paid by the payer in accordance with the time limit established in paragraph (1) of this subsection." *N.J.S.A.* 17B:26-9.1(d)(4), *N.J.S.A.* 17B:27-44.2(d)(4) and *N.J.S.A.* 26:2J-8.1(d)(4).

### 2. *New Jersey's Emergency Coverage Mandates*

58.      New Jersey regulations also mandate that insurance carriers determine

coverage promptly and pay promptly to ensure patient access to emergency care regardless of the patient's type of insurance coverage. Under this regulatory regime, New Jersey law requires healthcare insurers to notify their subscribers that they are entitled to have "access" and "payment of appropriate benefits" for emergency conditions on a "24 hours a day," "seven days a week" basis. *N.J.A.C.* 11:24A-2.5(b)(2). See In the Matter of Violations of the Laws of New Jersey by Aetna Health Inc., Order No. A07-59 (copy annexed hereto as Exhibit 7) at 3, ¶ 20 (Aetna "must pay the non-participating provider a benefit large enough to insure that the non-participating provider does not balance bill the member for the difference between his billed charges and the Aetna payment, even if it means that Aetna must pay the provider's billed charges less the member's network copayment, coinsurance or deductible.") (the "Order").

59.     Further, under New Jersey law prior to August 30, 2018, for the emergency/urgent treatment provided by Plaintiffs to Aetna Subscribers, insurers who provided coverage for emergency/urgent care and receive a claim for emergency/urgent care provided by an out-of- network hospital were required to pay an amount sufficient to protect the patient/insured from being balance billed. To meet this obligation, insurers could (a) pay the full amount of the charges, (b) negotiate a settlement of the claim with the provider, or (c) negotiate an in-network agreement with the provider. *Aetna Health, Inc. v. Srinivasan*, 2016 N.J. Super.

Unpub. LEXIS 1515 (App. Div., June 29, 2016).

> **3.** ***The OON Act Modifies New Jersey's Emergency Coverage Mandate, but Retains the Obligation for Insurers to Pay a Reasonable Rate***

60.     The New Jersey Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act ("OON Act"), codified at *N.J.S.A.* 26:2SS-1 to -20, modified HCAPPA's prompt payment requirements for inadvertent or emergency claims upon taking effect on August 30, 2018.  The OON Act applies to all health insurance plans in New Jersey other than self-funded plans governed by the federal Employee Retirement Income Security Act that have not opted into the law's coverage.

61.     Specifically, under the OON Act, for inadvertent or emergency out-of-network payments, the insurer must make a determination within 20 days from the date of receipt of a claim for services whether it considers the claim to be excessive. *N.J.S.A.* 26:2SS-9(c).  If not, the insurer must promptly pay the claim.  If the insurer considers the claim to be excessive, it must notify the provider of this determination within 20 days of receipt of the claim. If the insurer provides this notification, the insurer and the provider have 30 days from the date of notification to negotiate a settlement.   The insurer may attempt to negotiate a final reimbursement amount with the out-of-network healthcare provider, which differs from the amount paid by the insurer pursuant to the requirements under *N.J.S.A.*

26:2SS-9.

62.     If no settlement is reached after 30 days, the insurer must pay the provider the insurer's final offer for the services.  If the insurer and provider cannot agree on the final offer as a reimbursement rate for these services, the insurer, provider, or patient beneficiary, as applicable, may initiate binding arbitration within 30 days of the final offer, pursuant to *N.J.S.A.* 26:2SS-10.

63.     Binding arbitration under the OON Act is permissive, not mandatory, for claims subject to the OON Act. *N.J.S.A.* 26:2SS-7 ("If a covered person receives medically necessary services at an out-of-network health care facility on an emergency or urgent basis as defined by [EMTALA and *N.J.S.A.* 26:2H-18.64)], and the carrier and facility cannot agree on the final offer as a reimbursement rate for these services pursuant to section 9 of this act, the carrier, health care facility, or covered person, as applicable, *may* initiate binding arbitration pursuant to section 10 or 11 of this act") (emphasis added).

64.     The OON Act does not dispense with the requirement that insurers pay providers a reasonable amount for the services covered under the OON Act.  It just impacts who determines the reasonable rate.   For claims subject to the OON Act that are arbitrated, the arbitrator determines the appropriate amount payable. *N.J.S.A.* 26:2SS-10.  For claims that are not subject to the OON Act (such as claims where the Aetna Subscriber is covered by a self-funded ERISA Plan), or

claims for which arbitration has not been requested, healthcare providers may seek to enforce common law remedies to recover the reasonable value of their services from insurers. *See The Plastic Surgery Center, P.A. v. Aetna Life Ins. Co.*, No. 18-3381, 18-3356, 2020 WL 4033125 (3d Cir. July 17, 2020) (holding that plaintiff out-of-network health care provider could pursue state common law claims for breach of contract and promissory estoppel claims independent of ERISA, as they sought to enforce obligations independent of an ERISA plan); *Srinivasan*, 2016 N.J. Super. Unpub. LEXIS 1515 (App. Div., June 29, 2016) (upholding $2.1 million judgment in favor of out-of-network provider against health insurer on unjust enrichment claim).

65.     New Jersey law also provides interest as a penalty against insurers such as Aetna for overdue payments in the amount of 12% per annum, *N.J.S.A.* 17B:26-9.1(d)(9), *N.J.S.A.* 17B:27-44.2(d)(9) and *N.J.S.A.* 26:2J-8.1(d)(9), except during the pendency of arbitration under the OON Act, to the extent that the OON Act applies, *see N.J.S.A.* 26:2SS-10(c)(2).   The interest must be paid to the healthcare provider at the time the overdue payment is made.   *N.J.S.A.* 17B:27-44.2(d)(9) and *N.J.S.A.* 26:2J-8.1(d)(9).

### 4.     *Federal Coverage and Payment Mandates*

66.     The Patient Protection and Affordable Care Act ("ACA") added Section 2719A to the Public Health Services Act ("PHS Act"), 42 U.S.C. § 300gg-

19a.  Section 2719A requires any group health plan, or health insurer that provides or covers benefits with respect to services in an emergency department of a hospital, to cover any emergency services:  without the need for prior authorization; without regard to the provider's status as an in-network or out-of-network provider; and in a manner that ensures that the patient's cost-sharing requirement (expressed as a copayment amount or coinsurance rate) is the same requirement that would apply if such services were provided in-network.  42 U.S.C.  §  300gg-19a(b)(1).  These  cost-sharing  requirements  are  expressly incorporated into group health plans covered by ERISA.  *See* 29 U.S.C. § 1185d(a) (certain provisions of the PHS Act, including Section 2719A, "shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart").

67.    For out-of-network emergent claims, Aetna must ensure that it pays at least the greatest of three amounts specified in Regulations promulgated pursuant to Section 2719A.  29 C.F.R. § 2590.715- 2719A(b)(3)(i)(A)-(C).

68.    These regulations provide that, to satisfy the ACA's cost-sharing obligations, a non-grandfathered plan must pay the greatest of three possible amounts for out-of-network emergency services:  (1) the amount negotiated with in-network providers for the emergency service, accounting for in-network co-payment and co-insurance obligations; (2) the amount for the emergency service

calculated using the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary and reasonable charges), but substituting in-network cost-sharing provisions for out-of-network cost-sharing provisions; or (3) the amount that would be paid under Medicare for the emergency service, accounting for in-network co-payment and co-insurance obligations. 29 CFR § 2590.715-2719A(b)(3)(i)(A)-(C) (the "Greatest of Three regulation").[1] ADD PARA. The ACA permits balance billing of the providers' charges that exceed the allowable amount as long as there is no state prohibition on balance billing. 29 CFR § 2590.715-2719A(b)(3)(i).

69. Moreover, the Families First Coronavirus Response Act ("FFCRA") was enacted on March 18, 2020. Pub. L. No. 116-127 (2020). Section 6001 of the FFCRA generally requires group health plans and health insurers such as Aetna that offer group or individual health insurance coverage to provide benefits for certain items and services related to diagnostic testing for the detection and diagnosis of COVID-19, when those items or services are furnished on or after March 18, 2020, and during the applicable period of the federal COVID-19 public

---

[1] The "Greatest of Three" provision of the ACA was effectively superseded by provisions of the "No Surprises Act," which went into effect on January 1, 2022. (No Surprises Act, H.R. 3630, 116th Cong. (2019)). "The No Surprises Act" amended section 2719A of the PHS Act to include a sunset provision effective for plan years beginning on or after January 1, 2022, when the new protections under the No Surprises Act take effect." See interim final regulations titled "Requirements Related to Surprise Billing; Part I," (86 FR 36872, July 13, 2021).

health emergency declaration.[2]  Under the FFCRA, plans and health insurers must provide this coverage without imposing any cost-sharing requirements (including deductibles, copayments, and coinsurance) or prior authorization or other medical management requirements.

70.     Additionally, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted on March 27, 2020. Pub. L. No. 116-136 (2020). Section 3201 of the CARES Act amended Section 6001 of the FFCRA to include a broader range of diagnostic items and services that plans and health insurers such as Aetna must cover without any cost-sharing requirements or prior authorization or other medical management requirements.  Section 3202 of the CARES Act generally requires plans and health insurers providing coverage for these items and services to reimburse any provider of COVID-19 diagnostic testing an amount that equals the negotiated rate or, if the plan or issuer does not have a negotiated rate with the provider, the provider's published billed charges.

---

[2] The Secretary of Health and Human Services most recently extended the public health emergency period under the FFCRA through January 31, 2021.  *See* https://www.phe.gov/emergency/news/healthactions/phe/Pages/covid19-2Oct2020.aspx (last visited January 16, 2021).

**F.     Even Before the CarePoint Hospitals Became in-Network with Aetna, Aetna's Subscribers Regularly Sought and Obtained Treatment at the CarePoint Hospitals.**

71.     As noted above, between approximately March 15, 2016 and July 31, 2021, the CarePoint Hospitals provided hospital services to Defendants' Subscribers in connection with approximately eighteen thousand, six hundred fifty two (18,652) patient visits to a CarePoint Hospital when it was out-of-network with Defendants.

72.     Many of the Plans covering Defendants' Subscribers specifically provide "out-of-network" benefits for services rendered by out-of-network hospitals, such as the CarePoint Hospitals.  Importantly, patients pay significantly higher health care premiums in order to have access to out-of-network medical providers.  Patients pay the higher premiums to ensure that they will be able to obtain necessary medical services from the medical providers and medical facilities of their choice.

73.     Specifically, upon information and belief, regardless of the Plan type, all of Defendants' Plans provide for payment of out-of-network benefits in accordance with the "Allowable" or "Allowance" or "Allowed Charge" definition found in each Plan.

74.     Upon information and belief, each of Defendants' Plans define the "Allowable" or "Allowance" or "Allowed Charge" by reference to the usual or

customary rates in the relevant geographic area for the particular services provided, or a similar standard.   Upon information and belief, Plaintiffs' billed charges represent the usual or customary rates for the geographic areas in which they operate and, therefore, constitute the "Allowance" as defined in each Plan.

75.     Moreover, upon information and belief, in emergency or urgent care situations, the Plans either incorporate by reference the requirements of New Jersey's coverage and payment mandates described above, or they expressly provide that the "Allowable" or "Allowance" or "Allowed Charge" will be increased in emergency or urgent care situations in a manner consistent with New Jersey's coverage and payment mandates described above.

76.     Thus, upon information and belief, for emergency or urgent care that the CarePoint Hospitals provide to Defendants' Subscribers, all of the Plans require Defendants to pay the CarePoint Hospitals for their total billed charges, less the amount of patient responsibility (*i.e.,* co-payments, co-insurance, or deductibles), that the patient would have incurred had the patient sought emergent or urgent care treatment at an in-network hospital, consistent with New Jersey's coverage and payment mandates described above.

77.     For elective treatment, upon information and belief, the Plans provide for reimbursement of out-of-network providers at an amount representing 70% of the "Allowable" or "Allowance" or "Allowed Charge," less any applicable patient

responsibility under the Plans. Thus, upon information and belief, the Plans require Defendants to pay the CarePoint Hospitals at a rate of approximately 70% of their total billed charges, less applicable patient responsibility as defined in the Plan, for the elective treatment that Plaintiffs provide to Defendants' Subscribers.

### G. The CarePoint Hospitals Receive Complete Assignments of Benefits under Defendants' Plans for Treatment Provided to Defendants' Subscribers.

78. While out-of-network with Defendants, each CarePoint Hospital had no contract with Defendants setting forth the terms under which Defendants would pay for services that the CarePoint Hospital provide to patients who are Defendants' Subscribers.

79. Rather, as out-of-network providers, the CarePoint Hospitals provide healthcare services to all persons, including, but not limited to, those persons whose Plans allow them to receive services from providers who do not participate in their respective carrier's insurance network.

80. Under the terms of most Plans that provide coverage for out-of-network care, a patient is responsible for the payment of "coinsurance," a percentage of the out-of-network provider's charge for which the patient is responsible.

81. Upon registration at a CarePoint Hospital, all patients, including Defendants' Subscribers, execute a form titled "Assignment of Insurance

Benefits/Direct Payment/Authorized Representative/Agent" (the "AOB Contract"), among other documents.  In the AOB Contract, Defendants' Subscribers assign to the CarePoint Hospital their rights to benefits under Defendants' Plans.

82.   These AOB Contracts provide for the assignment to the CarePoint Hospital of all rights, benefits, and causes of action under one of Defendants' Plans:

> I hereby assign to the Hospital, all of my rights, benefits, privileges, protections, claims, causes of action, interests or recovery, to any and all rights, benefits, privileges, protections, claims, causes of action, interests, or recovery of any type whatsoever receivable by me or on my behalf arising out of any policy of insurance, plan, trust, fund, or otherwise providing health care coverage of any type to me (or to any other third party responsible for me) for the charges for services rendered to me by the hospital.  This includes, without limitation, any private or group health/hospitalization plan, automobile liability, general liability, personal injury protection, medical payments, uninsured or underinsured motor vehicle benefits, settlements/ judgments/verdicts, self-funded plan, trust, workers compensation, MEWA, collective, or any other third-party payor providing health care coverage of any type to me (or to any other third party responsible for me) for the charges for services rendered to me by the hospital [collectively, "Coverage Source"].  **This is a direct assignment to the Hospital of any and all of my rights to receive benefits arising out of any Coverage Source**.  I understand that this assignment of benefits is irrevocable.  This assignment of benefits fully and completely encompasses any legal claim I may have against any Coverage Source, including, but not limited to, my rights to appeal any denial of benefits on my behalf, to request and obtain plan documents, to pursue legal action against any coverage source, and/or to file a complaint with the New Jersey Department of Banking and Insurance.

83.     The AOB Contracts also provide for payment of any benefits directly

to the CarePoint Hospital:

> I authorize and direct payment be made by any and all coverage
> source directly to the hospital of all benefits, payments, monies,
> checks, funds, wire transfers or recovery of any kind
> whatsoever from any coverage source.  I also agree to assist the
> hospital in pursuing payment from any coverage source.  This
> includes, without limitation, signing documents requested or
> needed to pursue claims and appeals, getting documents from
> coverage source, or otherwise to support payment to the
> hospital.

84.     The AOB Contracts also provide for the CarePoint Hospital to act as

the Defendants Subscriber/Patient's authorized agent and representative to pursue

actions to recover benefits under one of Defendants' Plans:

> I hereby authorize and designate the Hospital as my authorized
> agent and representative to act on my behalf with respect to all
> matters related to all of my rights, benefits, privileges,
> protections, claims, causes of action, interests or recovery
> arising out of any Coverage Source.  This includes, without
> limitation, the Hospital requesting verification of coverage/pre-
> certification/authorization, filing pre-service and post-service
> claims and appeals, receiving all information, documentation,
> summary plan descriptions, bargaining agreements, trust
> agreements, contracts, and any instruments under which the
> plan is established or operated, as well as receiving any
> policies, procedures, rules, guidelines, protocols or other
> criteria considered by the coverage source, in connection with
> any claims, appeals, or notifications related to claims or
> appeals.

85.     These AOB Contracts provide, in part, that the patient is responsible for the payment of deductibles, copayments, coinsurance, and other charges not covered by the assignment:

> I understand that I am financially and legally responsible for charges not covered in full by the assignment of benefits …, including, but not limited to, any deductibles, copayments, and coinsurance amounts provided under any coverage source; and charges for which there is no Coverage Source.

86.     Thus, by the express language of the AOB Contracts, Plaintiffs may balance bill patients for amounts not covered by the assignments.  Consequently, in order to satisfy its obligations under New Jersey's coverage and payment mandates, described more fully above, Defendants must pay the CarePoint Hospitals for the difference between their billed charges and the amounts Defendants' Subscribers would have paid had they received treatment from an in-network facility for emergent/urgent treatment that the CarePoint Hospitals provide to Defendants' Subscribers.

87.     Upon information and belief, most of Defendants' Plans contain no anti-assignment provisions that would preclude subscribers from assigning their Plan benefits to the CarePoint Hospitals.

88.     Moreover, upon information and belief, many or most of Defendants' Plans expressly permit the subscribers to assign Plan benefits to health care providers with Defendants' consent.

- 29 -

89.     Defendants have consented to the assignments, or otherwise waived the applicability of any anti-assignment clauses, through an extended course of dealing, described more fully below.  Among other things, when it decides to pay a claim, Defendants often remit payment directly to the CarePoint Hospitals, without reliance on any purported anti-assignment clauses, albeit in amounts grossly inadequate relative to Plaintiffs' actual charges.  Defendants also force Plaintiffs to pursue Defendants' internal appeals process, only to frustrate Plaintiffs once they are engaged in that process, but again, without citing to any purported anti-assignment clauses.  This and other conduct described more fully below amounts to Defendants' consent to its subscribers' assignments of Plan benefits to the CarePoint Hospitals, or at a minimum, is an extended course of dealing that is inconsistent with any alleged anti-assignment clauses.

90.     Further, to the extent that any of the Plans have anti-assignment clauses, they are barred by New Jersey's Assignment of Benefits Law, which provides:

> With respect to a carrier which offers a managed care plan that provides for both in-network and out-of-network benefits, *in the event that the covered person assigns, through an assignment of benefits, his right to receive reimbursement for medically necessary health care services to an out-of-network health care provider, the carrier shall remit payment for the reimbursement directly to the health care provider* in the form of a check payable to the health care provider, or in the alternative, to the health care provider and the covered person as joint payees, with a signature line for each of the payees.  Payment shall be

> made in accordance with the provisions of this section and [*N.J.S.A.* 17B:30-23 *et seq.*]. Any payment made only to the covered person rather than the health care provider under these circumstances shall be considered unpaid, and unless remitted to the health care provider within the time frames established by [*N.J.S.A.* 17B:30-23 *et seq.*], shall be considered overdue and subject to an interest charge as provided in that act.

*N.J.S.A.* 26:2S-6.1(c) (emphasis added).

### H. Defendants Drastically and Unlawfully Underpay the CarePoint Hospitals' Claims.

91. During the Claim Period, the CarePoint Hospitals, as out-of-network providers, rendered medical services in connection with approximately 18,652 patient visits by Aetna Subscribers.

92. Aetna denied or underpaid the CarePoint Hospitals for the 9,910 Underpaid Claims during the Claim Period as follows:

a. During the Claim Period, Christ Hospital provided hospital services relating to approximately 3,209 patient visits by Aetna Subscribers. Of those patient visits: 1,969 were for emergency/urgent care; and 1,240 were for non-emergency/non-urgent ("Elective") care within the scope of the out-of-network benefits provided under the patients' Plans.

b. During the Claim Period, BMC provided hospital services relating to approximately 2,722 patient visits by Aetna Subscribers. Of those patient visits: 1,604 were for emergency/urgent care; and 1,118 were

for non-emergency/non-urgent ("Elective") care within the scope of the out-of-network benefits provided under the patients' Plans.

c.     During the Claim Period, HUMC provided hospital services relating to approximately 3,979 patient visits by Aetna Subscribers. Of those patient visits: 2,704 were for emergency/urgent care; and 1,275 were for non-emergency/non-urgent ("Elective") care within the scope of the out-of-network benefits provided under the patients' Plans.

93.     The CarePoint Hospitals' billed charges for these Underpaid Claims during the Claim Period total approximately $328,499,271 for Aetna Subscribers, reflecting the CarePoint Hospitals' usual and customary rates for the particular medical services provided, but Aetna underpaid each of these claims.

94.     Assuming an average patient responsibility (*i.e.*, copayments, coinsurance, and deductibles) under the applicable Plans of ten percent (10%) of the charges for emergency/urgent care and thirty-percent (30%) of the charges for Elective care, Aetna is responsible for $237,263,774 and $45,410,999 of the total charges, respectively; the grand total of Aetna's responsibility is $282,674,773.

95.     However, to date, Aetna has paid the CarePoint Hospitals for only a portion of this amount - $101,275,736 of its responsibility. The current unpaid balance due to the CarePoint Hospitals by Aetna is at least $181,399,037 of its responsibility with respect to the claims.

96.    The charges billed by the CarePoint Hospitals to Aetna for the Underpaid Claims during the Claim Period represent CarePoint's normal billed charges for the services provided, and they also represent the usual, customary, and reasonable amounts billed by similarly situated health care providers in the relevant geographic areas.

97.    Indeed, Aetna recognized the reasonableness of CarePoint's charges. During the Claim Period, the three CarePoint Hospitals billed Aetna the total of $243,759,396 for another 8,742 claims (the "Correctly Paid Claims"), for which Aetna reimbursed the CarePoint Hospitals $230,757,782, or 94.67% of the CarePoint Hospitals' billed charges.

98.    Further underscoring the reasonableness of the CarePoint Hospitals' billed charges is the fact that, during the Claim Period, the CarePoint Hospitals treated a low percentage of patients insured by commercial insurance carriers, yet the hospitals were required to provide emergency care to any patient regardless of the patient's ability to pay and regardless of source of insurance payment.

99.    Under the terms of the relevant Plans, patients have certain cost-sharing obligations to pay co-payments, co-insurance, and deductibles ("Patient Responsibility") for the treatment they receive at the CarePoint Hospitals.

100.    With respect to the total charges for emergency/urgent care, the Patient Responsibility on average is less than 10%.    Even assuming,

conservatively, that the patient responsibility averages a full 10%, Aetna is responsible for the remaining 90% or approximately $237 million of the Underpaid claims attributable to emergency/urgent care ("Underpaid Emergency Claims"). However, to date, Aetna has reimbursed the CarePoint Hospitals less than $88 million for the Underpaid Emergency Claims, leaving a balance due to the CarePoint Hospitals of approximately $149 million on the Underpaid Emergency Claims during the Claim Period.

101.   With respect to the total charges for elective care, the patient responsibility on average is less than 30%.  Even assuming, conservatively, that the patient responsibility averages a full 30%, Aetna is responsible for the remaining 70% or approximately $45 million of the Underpaid Claims attributable to elective care ("Underpaid Elective Claims").   However, to date, Aetna has paid the CarePoint Hospitals less than $14 million for the Underpaid Elective Claims, leaving a balance due to the CarePoint Hospitals on the Underpaid Elective Claims during the Claim Period of approximately $31 million.

102.   Exhibits 1 through 5, which are attached hereto and incorporated herein by reference, are spreadsheets detailing the following information during the Claim Period:

a.   Exhibit 1 summarizes all of the 9,910 Underpaid Claims at all three CarePoint Hospitals during the Claim Period, including the CarePoint

Hospitals' total charges, total payments, count of account numbers, and outstanding amounts due for all underpaid claims, broken down by claims relating to emergency/urgent care (designated as "Emergency") and non-emergency/elective care (designated as "Elective") provided for Aetna Subscribers, and also broken down by year.

b.      Exhibits 2 through 4 provide a summary as to BMC, HUMC, and Christ Hospital, respectively, each providers' total charges, total payments, count of account numbers, and outstanding amounts due for the Underpaid Claims during the Claim Period, broken down between Emergency and Elective care provided for Aetna Subscribers.

c.      Exhibit 5 provides a summary of all claims paid by Aetna during the Claim Period (combining the 9,910 Underpaid Claims and the 8,742 Correctly Paid Claims, for all CarePoint Hospitals combined and broken down by hospital, listing the total charges, total payments, and count of account numbers for all claims, broken down by claims relating to emergency/urgent care (designated as "ER" or "Emergency") and non-emergency/elective care (designated as "Elective") provided for Aetna Subscribers.

d.      Exhibit 6 provides claim-specific information as to each of the underpaid claims, including the Facility, Account Number, Admit Date, Discharge Date, IPOP Flag (inpatient/outpatient/same day service), Service Type, Total

Charges, Total Payments, and Policy Number.   Because Exhibit 6 contains information regarding medical treatment provided to specific patients (although patient names and other personal identifiers were excluded), the CarePoint Hospitals have filed Exhibit 6 under seal.

I.     **Defendants Violate the Terms of the Applicable Plans and the Emergency Care Mandate.**

103.   As noted above, for emergent/urgent care, New Jersey law requires Defendants to pay the CarePoint Hospitals for the difference between their billed charges and the amounts Defendants' Subscribers would have paid had they received treatment from an in-network facility.   As described above, this requirement is incorporated into all of Defendants' fully-insured Plans and the self-insured Plans for which Defendants are fiduciaries.

104.   As noted above, Aetna paid less than $88 million, or less than 34%, of the CarePoint Hospitals' total billed charges for the Underpaid Emergency Claims during the Claim Period.

105.   Upon information and belief, during the Claim Period, Defendants improperly calculated the reimbursement owed to the CarePoint Hospitals for the Underpaid Emergency Claims by (a) multiplying the applicable Medicare rates by a percentage which is unilaterally and arbitrarily selected by Defendants and may range anywhere from 150% to 325%; or (b) multiplying Defendants' in-network rates by a percentage which is unilaterally and arbitrarily selected by Defendants.

Using the amounts so calculated, instead of the provider's charges, Defendants then apply the in-network level of benefits under the Plan.

106.    This practice is contrary to law and the terms of the Aetna Plans. During the Claim Period, in accordance with the Greatest of Three regulation and the terms of the Plans themselves, Aetna was required to hold the patients harmless from the out-of-network providers for all of the providers' billed charges, other than the cost-sharing the patient would be required to pay had the patient received the services from an in-network provider.

107.    Moreover, as noted above, Aetna paid the CarePoint Hospitals less than $14 million of the $45 million the CarePoint Hospitals billed to Aetna for the Underpaid Elective Claims, or less than 31% of the CarePoint Hospitals' billed charges for the Underpaid Elective Claims.

108.    Aetna's underpayments to the CarePoint Hospitals for the Underpaid Elective Claims also violates the terms of the Plans.  Specifically, for elective and other non-emergent care, Plans containing out-of-network benefits require payment of medical expenses incurred by Defendants' Subscribers at what the Plans define as the "recognized charge."[3]

---

[3] All of the Plans exclude out-of-network emergency services from the definition of the "recognized charge."  As set out above, such services must instead be reimbursed in accordance with the Greatest of Three Regulation and in a manner that ensures that patients are held harmless for the providers' billed charges in excess of their in-network level of Patient Responsibility.

109.    One example of an Aetna Plan defines "recognized charge" to be "the reasonable amount rate," which in turn, is defined as the "80th percentile value reported in a database prepared by FAIR Health" for professional services and "the Facility charge rate (FCR)" for inpatient and outpatient charges of hospital." [4]

110.    Another example defines "recognized charge" for out-of-network providers as "the lesser of:  what the Provider bills or submits for that service or supply; …and the 90th percentile of the prevailing charge rate for the geographic area where the service is furnished for professional services and other services from a Non-Participating Provider."

111.    Other examples define" "recognized charge" by reference to another external source, or a multiple of the Medicare allowable rate.

112.    Thus, all Aetna's Plans and applicable law require that the Plans pay the out-of-network provider's full billed charges, less the cost-sharing the patient

---

[4] The FCR in this definition is defined as:

> an amount that [Aetna] determines is enough to cover the facility provider's estimated costs for the services and lave the facility provider with a reasonable profit.  For hospitals and other facilities that report costs (or cost-to-charge ratios) to CMS, the FCR rate is based on what the facilities report to CMS.  For facilities that do not report costs (or cost-to-charge ratios) to CMS, the FCR rate is based on statewide averages of the facilities that do report to CMS. We may adjust the formula as needed to maintain the reasonableness of the recognized charge. For example, we may make an adjustment if we determine that in a particular state the charges of ambulatory surgery centers (or another class of facility) are much higher than charges of facilities that report costs (or cost-to-charge ratios) to CMS.

would be required to pay had the patient received the services from an in-network provider.

113.   The CarePoint Hospitals' total billed charges for elective treatment reflect their usual and customary rates for the particular medical services provided. The amounts paid by Defendants (even after factoring in amounts that Defendants contend are the patients' responsibility under the applicable Plans, *e.g.*, copayments, coinsurance, and deductibles) fall far short of the usual and customary rates required under the Plans.

114.   Significantly, Defendants' Subscribers who seek treatment at the CarePoint Hospitals pay higher premiums, at times substantially higher premiums, for the right under the Plans to receive medical treatment from the provider of their choice, including from out-of-network providers such as the CarePoint Hospitals. The Defendants' Subscribers bargain for and expect that payment will be made at the providers' usual and customary rates. Defendants' improper processing of the Underpaid Claims for the rendering of medical treatment for Defendants' Subscribers falls far below these reasonable expectations.

115.   Upon information and belief, Defendants acted as the Plan administrator and as fiduciaries to the Defendants' Subscribers for each of the claims at issue in this case. Defendants exercised discretion, authority, control and oversight in determining if Plan benefits would be paid and the amounts of Plan

benefits that would be paid.  Defendants' improper administration of these claims resulted in the underpayment of Plaintiffs on these claims by over $150 million.

**J.    The CarePoint Hospitals Exhaust Available Internal Appeals Remedies.**

116.    Upon information and belief, all available appeals avenues under the Defendants' Plans applicable to the Underpaid Claims at issue have either been exhausted or rendered futile by Defendants' refusal to process appeals.

117.    Upon information and belief, such Plans generally provide for administrative appeal of claim decisions to be processed by Defendants.  The CarePoint Hospitals routinely file such internal appeals with the result that Defendants adhere to their initial decision.

118.    Nearly all of the Underpaid Claims covered by fully insured Plans for which the CarePoint Hospitals have completed the internal appeals with Defendants have resulted in Defendants simply affirming their initial decision with little or no analysis.  Accordingly, it would be futile for the CarePoint Hospitals to continue to even pursue the internal appeals process with Defendants for any further claims.

119.    Plans that are self-funded by the employer or other organization likewise include provisions for appealing claims decisions.  The CarePoint Hospitals obtain copies of the summary plan descriptions to identify the appeals

process under the Plan that applies to each claim and routinely files appeals in accordance with the Plan's prescribed procedure.

120.   Like fully insured Plans, upon information and belief, the self-funded plans typically provide for internal appeals with Defendants and, where required, an external appeal per the summary plan description or to the Department of Labor (ERISA).  The CarePoint Hospitals have timely requested such internal appeals for the Underpaid Claims covered by the self-funded Plans at issue, with the possible exception of recent claims for which the CarePoint Hospitals have not yet received Defendants' initial claims decision or the time for filing a request for internal appeal has not yet expired.

121.   Nearly all of the Underpaid Claims covered by self-funded Plans for which the CarePoint Hospitals have completed the internal appeals with Defendants have likewise resulted in Defendants simply affirming its initial decision with little or no analysis.   Accordingly, it would be futile for the CarePoint Hospitals to continue to seek internal appeals with Defendants for any further claims.  Given the above, it would also be futile for the CarePoint Hospitals to continue to request external appeals for future claims.

122.   After the CarePoint Hospitals became in-network with Aetna, CarePoint Health System's Vice President of Managed Care Strategy and Contracting, Bradley G. Gingerich, reached out to his counterpart at Aetna,

Jonathan Reese to discuss certain cases that Aetna believed to be COVID-19-related cases valued at approximately $11.8 million.

123.   CarePoint informed Aetna that these cases were <u>not</u> COVID-19-related and Aetna should review and release the claims so that CarePoint either could continue to pursue them against Aetna and/or balance bill the patients.

124.   After several months of communications, Aetna ultimately refused to reprocess those claims.

125.   On several occasions, both prior to CarePoint joining Aetna's network, CarePoint approached Aetna regarding settling all accounts receivable. Aetna showed no interest in compromise and suggested that CarePoint should balance bill the patients for the outstanding amounts.

126.   Moreover, Defendants have failed to adequately explain the basis for their dramatic underpayments to the CarePoint Hospitals on the Underpaid Claims. In particular, Defendants have failed or refused to:  (a) provide the specific reason or reasons for the denial of claims; (b) provide the specific Plan provisions relied upon to support the denials; (c) provide the specific rule, guideline or protocol relied upon in making the decision to deny claims; (d) describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code; and (e) notify the relevant parties that they are entitled to

have, free of charge, all documents, records and other information relevant to the claims for benefits.

127.    This action is timely commenced within six years after the CarePoint Hospitals were notified by Defendants that Defendants were rejecting or dramatically underpaying the Underpaid Claims for the services that the CarePoint Hospitals provided to Defendants' Subscribers, and otherwise within six (6) years after each of the Underpaid Claims against Defendants accrued.

## CAUSES OF ACTION

### COUNT ONE
**(Breach of Plan Provisions for Benefits in
Violation of ERISA § 502(a)(1)(B))**

128.    Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

129.    The CarePoint Hospitals have standing to pursue claims under ERISA as the assignees and authorized representatives of the Defendants' Subscribers' claims under the Plans.

130.    As the assignees of the Defendants' Subscribers, the CarePoint Hospitals are entitled to payment under the ERISA Plans for the hospital services provided to the Defendants' Subscribers at the CarePoint Hospitals.

131.    Upon information and belief, the Plans did not prohibit the Defendants' Subscribers from assigning their rights to benefits under the Plans to

the CarePoint Hospitals, including the right of direct payment of benefits under the Plans to the CarePoint Hospitals.

132.    Moreover, to the extent that the Plans prohibited the assignment of benefits to the CarePoint Hospitals, Defendants have waived any purported anti-assignment provisions, have ratified the assignment of benefits to the CarePoint Hospitals, and/or are estopped from using any purported anti-assignment provisions against the CarePoint Hospitals due to Defendants' course of dealing with and statements to the CarePoint Hospitals as out-of-network providers, discussed more fully above.

133.    And to the extent that the Plans prohibited the assignment of benefits to the CarePoint Hospitals, any such purported anti-assignment prohibitions are unenforceable as, among other things, contrary to public policy, as adhesion contracts, and/or due to a lack of privity with the CarePoint Hospitals.

134.    All of the Plans require payment of medical expenses incurred by Defendants' Subscribers at the rate of the CarePoint Hospitals' full billed charges (less in-network patient responsibility) for emergency/urgent care, and at the usual or customary rates for Elective care.

135.    The CarePoint Hospitals' billed charges represent the hospitals' usual and customary rates for the treatment provided to Defendants' Subscribers.

136.    Defendants breached the terms of the Plans by refusing to make out-of-network payments for charges covered by the Plans, in violation of ERISA 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  These breaches include, among other things, refusing to pay the CarePoint Hospitals' billed charges (less in-network patient responsibility) for emergency/urgent care that the CarePoint Hospitals provided to Defendants' Subscribers, as required by the Plans; refusing to pay the CarePoint Hospitals the usual and customary charges for Elective care provided to Defendants' Subscribers, as required by the Plans; and otherwise refusing to pay the CarePoint Hospitals the amounts due under the Plans for the medically necessary procedures and services performed at the CarePoint Hospitals.

137.    As a result of, among other acts, Defendants' numerous procedural and substantive violations of ERISA, any appeals are deemed exhausted or excused, and the CarePoint Hospitals are entitled to have this Court undertake a *de novo* review of the issues raised herein.

138.    Under 29 U.S.C. § 1132(a)(1)(B), the CarePoint Hospitals are entitled to recover unpaid/underpaid benefits from Defendants, as well as attorneys' fees.

## COUNT TWO
### (Breach of Fiduciary Duties of Loyalty
### and Due Care in Violation of ERISA)

139.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

140.   Pursuant to 29 U.S.C. § 1132(a)(3), a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

141.   The CarePoint Hospitals, as the assignees of ERISA members and beneficiaries under the Plans, are entitled to assert a claim for relief for Defendants' breach of fiduciary duty of loyalty and care and for failure to follow Plan documents under 29 U.S.C. § 1104(a)(1)(B) and (D).

142.   Defendants exercised discretion, control, authority and oversight in determining whether Plan benefits would be paid and the amounts of Plan benefits that would be paid.

143.   As ERISA fiduciaries, Defendants owed the CarePoint Hospitals a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character.  Further, as fiduciaries, Defendants were required to

ensure that they were acting in accordance with the documents and instruments governing the Plans, and in accordance with ERISA § 404(a)(l)(B) and (D), 29 U.S.C. § 1104(a)(l)(B) and (D). In failing to act prudently, and in failing to act in accordance with the documents governing the Plans, Defendants have violated their fiduciary duty of care.

144. As fiduciaries, defendants also owed the CarePoint Hospitals a duty of loyalty, defined as an obligation to make decisions in the interest of its beneficiaries and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with ERISA § 404(a) (l) (A), 29 U.S.C. § 1104(a)(l)(A) and ERISA § 406, 29 U.S.C. § 1106. Thus, Defendants could not make benefit determinations for the purpose of saving money at the expense of the Defendants' Subscribers.

145. Defendants violated their fiduciary duty of loyalty to the CarePoint Hospitals by, among other things, refusing to make out-of-network payments for hospital services provided at the CarePoint Hospitals for Defendants' own benefit and at the expense of Defendants' Subscribers.

146. In addition, Defendants violated their fiduciary duty of loyalty by failing to inform the CarePoint Hospitals, as assignees of the Defendants' Subscribers, of information material to the claims and Defendants' handling of the claims.

147.    Defendants further violated their fiduciary duty of loyalty by taking actions to frustrate their subscribers' entitlement to out-of-network benefits under the Plans by, among other things, arbitrarily terminating from their insurance networks physicians who refer their patients to the CarePoint Hospitals.

148.    The CarePoint Hospitals have standing to pursue claims under ERISA as assignees and authorized representatives of the Defendants' Subscribers.

149.    The CarePoint Hospitals are entitled to relief to remedy Defendants' violations of their fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including monetary relief.

## COUNT THREE
### (Denial of Full and Fair Review
### in Violation of ERISA § 503)

150.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

151.    As assignees and authorized representatives of the Defendants' Subscribers' claims, the CarePoint Hospitals are entitled to receive protection under ERISA, including (a) a "full and fair review" of all claims denied by Defendants; and (b) compliance by Defendants with applicable claims procedure regulations.

152.    Although Defendants are obligated to provide a "full and fair review" of denied claims pursuant to ERISA § 503, 29 U.S.C. § 1133 and applicable regulations, including 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590.715-2719, Defendants have failed to do so by, among other actions:

    a.    refusing to provide the specific reason or reasons for the denial of claims;

    b.    refusing to provide the specific Plan provisions relied upon to support its denials;

    c.    refusing to provide the specific rule, guideline or protocol relied upon in making the decisions to deny claims;

    d.    refusing to describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code;

    e.    refusing to notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits; and

    f.    refusing to provide a statement describing any voluntary appeals procedure available, or a description of all required information to be given in connection with that procedure.

153.    By failing to comply with the ERISA claims procedure regulations, Defendants failed to provide a reasonable claims procedure.

154.    Because Defendants have failed to comply with the substantive and procedural requirements of ERISA, any administrative remedies are deemed exhausted pursuant to 29 C.F.R. § 2560.503-1(l) and 29 C.F.R. § 2590.715-

2719(b)(2)(ii)(F)(1). Exhaustion is also excused because it would be futile to pursue administrative remedies, as Defendants do not acknowledge any basis for their denials and thus offer no meaningful administrative process for challenging its denials.

155.    The CarePoint Hospitals have been harmed by Defendants' failure to provide a full and fair review of appeals submitted under ERISA § 503, 29 U.S.C. § 1133, and by Defendants' failures to disclose information relevant to appeals and to comply with applicable claims procedure regulations.

156.    The CarePoint Hospitals are entitled to relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including monetary relief, to remedy Defendants' failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claims procedure regulations.

## COUNT FOUR
### *(Quantum Meruit)*

157.    Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

158.    Under New Jersey law, a cause of action for *Quantum Meruit* requires (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.

159.    To comply with their ethical and legal obligations under federal and

New Jersey law, Plaintiffs provided emergency medical treatment and services to Aetna Subscribers in good faith during the Claim Period.

160.    Aetna could not lawfully prevent its members from seeking emergency medical care from the CarePoint Hospitals.  Thus, the parties were, in effect, compelled to do business with each other.

161.    Given the nature of these relationships, an equitable obligation arises to account for the value of the services Plaintiffs provided to Aetna Subscribers.

162.    Aetna Subscribers accepted the treatment and services that Plaintiffs provided to them.

163.    At the time Plaintiffs treated Aetna Subscribers, Plaintiffs reasonably expected to be compensated for the medical treatment and services that Plaintiffs provided to Aetna Subscribers and, accordingly, submitted claims to Aetna for payment for this treatment and services, listed on Exhibit 6.

164.    The reasonableness of Plaintiffs' expectation is underscored by the state and federal laws described more fully above requiring Aetna to reimburse Plaintiffs promptly and fairly.

165.    Thus, Defendants are obligated to reimburse the Plaintiffs for the reasonable value of the services they provided.

166.    By providing treatment and services to Aetna Subscribers, Plaintiffs have also directly benefitted Aetna. Specifically, for each claim for reimbursement

that Plaintiffs submitted to Aetna, Aetna has drawn down from the trust funds of the health insurance plans the full charge amount of Plaintiffs' claims and impermissibly retained those funds for their own purpose.

167.    The reasonable value of the treatment and services that Plaintiffs rendered to Aetna Subscribers is the full amount of their billed charges.

168.    As set out more fully above, Aetna has drastically underpaid Plaintiffs and, therefore, has not reimbursed Plaintiffs for the reasonable value of the treatment and services that Plaintiffs rendered to Aetna Subscribers.

169.    Accordingly, under the doctrine of *Quantum Meruit*, Aetna is liable to Plaintiffs for the full amount of Plaintiffs' billed charges during the Claim Period, less any amounts actually paid by Aetna and any applicable Patient Responsibility Amounts.

## COUNT FIVE
### (Violation of New Jersey Health Claims Authorization, Processing and Payment Act ("HCAPPA"))

170.    Plaintiffs re-allege and incorporate by reference the allegations of the foregoing paragraphs as if fully set forth herein.

171.    HCAPPA requires health insurers such as Aetna to pay health care providers' claims promptly, provided that the claims meet the criteria for payment set forth in *N.J.S.A.* 17B:26-9.1(d)(1), *N.J.S.A.* 17B:27-44.2(d)(1) and *N.J.S.A.* 26:2J-8.1(d)(1).

172.    Specifically, for out-of-network emergency claims governed by the OON Act post August 30, 2018 -- such as the claims for the emergency treatment the CarePoint Hospitals provided Aetna Subscribers between August 30, 2018 and July 31, 2021 -- New Jersey law requires that such claims be paid in full no more than 50 days after electronic submission, except to the extent disputed in accordance with the procedures of the OON Act. *See N.J.S.A.* 26:2SS-9.

173.    Plaintiffs' claims for the emergency treatment they provided to Aetna Subscribers since May August 30, 2018, meet all the criteria for payment under HCAPPA, *N.J.S.A.* 17B:26-9.1(d)(1), *N.J.S.A.* 17B:27-44.2(d)(1) and *N.J.S.A.* 26:2J-8.1(d)(1).  As described more fully above, on the dates the services were provided, the Aetna covered the out-of-network emergency services Plaintiffs' physicians provided to Aetna Subscribers, and Plaintiffs' agents submitted the claims to Aetna on the appropriate claim forms.

174.    However, also as described more fully above, Aetna failed to remit full reimbursement of Plaintiffs' charges for healthcare services, or provide a written explanation for the failure to pay all or a portion of such claims, within the statutorily proscribed time frames under HCAPPA or the OON Act.

175.    Moreover, as described more fully above, Aetna failed to provide written notice specifying that that Plaintiffs' out-of-network emergency claims were incomplete or contained incorrect information, that Aetna disputed the

amounts claimed in whole or in part, or that there was strong evidence of fraud, as HCAPPA requires of any carrier that fails to timely pay a claim for reimbursement. *N.J.S.A.* 17B:26-9.1(d)(2), *N.J.S.A.*17B:27-44.2(d)(2), or *N.J.S.A.* 26:2J-8.1(d)(2)). Nor did Aetna seek to dispute any of Plaintiffs' out-of-network claims in accordance with the OON Act.

176.    Aetna's failure to timely pay the full amounts due to Plaintiffs for their out-of-network emergency claims for services provided during the relevant portion of the Claim Period has resulted overdue payments under HCAPPA.

177.    By reason of the foregoing, Plaintiffs are entitled to recover from Aetna the full underpaid and unpaid amounts on all of Plaintiffs' out-of-network emergency claims for services since between August 30, 2018 and July 31, 2021 together with statutory interest in the amount of 12% per annum, *N.J.S.A.* 17B:26-9.1(d)(9), *N.J.S.A.* 17B:27-44.2(d)(9) and *N.J.S.A.* 26:2J-8.1(d)(9).

## COUNT SIX
### (Breach of Contract – non-ERISA)

178.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

179.    To the extent that some of the Plans are not employee welfare benefit plans governed by ERISA, they are nonetheless valid and enforceable insurance contracts.

180.    As set forth more fully above, upon information and belief, all of the

Plans require payment of medical expenses incurred by Defendants' Subscribers at usual or customary rates. Further, under the terms of the Plans, Defendants' Subscribers are entitled to coverage for the services that they received from the CarePoint Hospitals.

181. By virtue of the AOB Contracts executed by Defendants' Subscribers, the CarePoint Hospitals were assigned the right to receive payment under the Plans for the services rendered to the Defendants' Subscribers. Pursuant to said AOB Contracts, Defendants are contractually obligated to pay the CarePoint Hospitals for these services.

182. Defendants' failed to make payment of benefits to the CarePoint Hospitals in the manner and amounts required under the terms of the Plans.

183. As the result of Defendants' failures to comply with the terms of the Plans, the CarePoint Hospitals, as assignees, have suffered damages and lost benefits for which they are entitled to recover damages from Defendants, including unpaid benefits, restitution, interest, and other contractual damages sustained by the CarePoint Hospitals.

## COUNT SEVEN
### (Breach of the Duty of Good Faith and
### Fair Dealing – non-ERISA)

184.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

185.   As set forth more fully above, if any of the Plans are not employee welfare benefit plans governed by ERISA, they are nonetheless valid and enforceable insurance contracts.   As such, the Plans contain an implied duty of good faith and fair dealing.

186.   Defendants, as the obligors under the Plans, owed the Defendants' Subscribers a duty of good faith and fair dealing with respect to said Plans.

187.   As set forth more fully above, the Defendants' Subscribers received health care services at the CarePoint Hospitals and executed AOB Contracts, among other documents, in which they assigned to the CarePoint Hospitals their right to benefits under the Plans for the services that the CarePoint Hospitals provided to the Defendants' Subscribers.

188.   By virtue of these assignments, Defendants also owe this duty of good faith and fair dealing to the CarePoint Hospitals.

189.   Defendants breached their duty of good faith and fair dealing owed to the CarePoint Hospitals, as assignees of rights and benefits under the Plans, in a number of ways, described more fully above.

190.   Moreover, *N.J.S.A.* 17:29B-3, *et seq*., defines the public interests of New Jersey and prohibits unfair methods of competition and unfair or deceptive acts or practices in the business of insurance.

191.   Without limitation, Defendants' breaches include, but are not limited to, Defendants:

      a.    using unilaterally and arbitrarily selected percentages of Medicare or in-network rates in determining amounts it will pay to out-of-network providers for emergency/urgent care provided to Defendants' Subscribers, when Defendants' liability for the full charges was reasonably clear;

      b.    failing to provide the CarePoint Hospitals with adequate written explanations for the failure to pay all or a portion of the CarePoint Hospitals' claims for the services provided to Defendants' Subscribers;

      c.    failing to pay the CarePoint Hospitals' charges for the health care services provided to Defendants' Subscribers, and failing to provide adequate written explanations for the refusal to pay all or a portion of such claims, within the statutorily prescribed time frames;

      d.    using arbitrary methodology for determining whether to pay and, if so, the amount to pay the CarePoint Hospitals for the services the CarePoint Hospitals provided to Defendants' Subscribers;

      e.    providing patently inadequate explanations for its under-payments of the CarePoint Hospitals;

      f.    not attempting in good faith to effectuate prompt, fair and equitable settlement of claims for which liability had become reasonably clear;

g.    compelling the CarePoint Hospitals to institute litigation to recover amounts due under the Plans by refusing to pay claims properly;

h.    failing to promptly provide a reasonable explanation of the basis in the Plans in relation to the facts or applicable law for nonpayment and underpayment of the CarePoint Hospital's claims;

i.    violating applicable statutory and regulatory provisions governing the business of insurance;

j.    committing unfair and deceptive acts and practices in handling the CarePoint Hospitals' claims;

k.    making use of funds which should have been paid to the CarePoint Hospitals pursuant to their claims for benefits under the Plans; and

l.    ignoring its own ethical standards and claims-handling procedures, which require that a claims-handler discover and disclose all bases for finding – not avoiding – insurance coverage.

192.    Defendants' conduct in derogation of their duty of good faith and fair dealing under the Plans has deprived the CarePoint Hospitals of their reasonable expectations and benefits as assignees of benefits under the Plans warranting monetary damages.

## COUNT EIGHT
### (Promissory Estoppel)

193.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

194.    Defendants represented to the CarePoint Hospitals that the medical treatment sought by the Defendants' Subscribers as patients at the CarePoint Hospitals was covered procedures under the Plans, and that the fees associated with that treatment were covered charges under the Plans.  Based on Defendants' statements that the patients seeking medical care and treatment had active coverage and benefits, the CarePoint Hospitals reasonably understood that some payment would be forthcoming for the hospital services provided at the CarePoint Hospitals related to these procedures.

195.    The CarePoint Hospitals provided hospital services to Defendants' Subscribers in reliance on Defendants' statements regarding coverage and benefits.

196.    The CarePoint Hospitals relied upon Defendants' representations, authorizations, and promises to their detriment.

197.    This reliance was foreseeable, as Defendants' representations were made in the context of telephone calls from the CarePoint Hospitals' billing agents to verify, confirm, and pre-certify coverage prior to the hospital services being provided, and there was no ability for the CarePoint Hospitals to learn, separate and apart from Defendants' representations, whether Defendants considered the fees related to these hospital services to be covered charges under the relevant Plans.

198.   Defendants are now estopped from denying full and complete payment for the claims at issue in this Complaint.

199.   As a result of the CarePoint Hospitals' reliance on Defendants' statements, the CarePoint Hospitals have suffered and continue to suffer injury, including money damages, and injustice can only be avoided by Defendants honoring their previous promises.

## CONDITIONS PRECEDENT

200.   All conditions precedent have been performed or have occurred.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the CarePoint Hospitals hereby request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the CarePoint Hospitals demand judgment in their favor against Defendants as follows:

A.   Unpaid/underpaid benefits from Defendants, as well as attorneys' fees, under 29 U.S.C. § 1132(a)(1)(B);

B.   Declaring that Defendants violated their fiduciary duties under § 404 of ERISA, 29 U.S.C. § 1104, and awarding monetary relief and attorneys' fees under 29 U.S.C. § 1132(a)(3);

C.     Declaring that Defendants failed to provide a "full and fair review" under § 503 of ERISA, 29 U.S.C. § 1133, and applicable claims procedure regulations, and that "deemed exhaustion" under such regulations is in effect as a result of Defendants' actions, as well as awarding monetary relief to ensure compliance with ERISA and its claims procedure regulations;

D.     Payment the full amount of Plaintiffs' billed charges during the Claim Period, less any amounts actually paid by Aetna and any applicable Patient Responsibility Amounts on Plaintiff's *Quantum Meruit* claim;

E.     The full underpaid and unpaid amounts on all of Plaintiffs' out-of-network emergency claims for services since between August 30, 2018 and July 31, 2021 together with statutory interest in the amount of 12% per annum, *N.J.S.A.* 17B:26-9.1(d)(9), *N.J.S.A.* 17B:27-44.2(d)(9) and *N.J.S.A.* 26:2J-8.1(d)(9)

F.     Declaring that Defendants have breached the terms of the Plans with regard to out-of-network benefits and awarding damages for unpaid out-of-network benefits;

G.     Compensatory and consequential damages resulting from injury to Plaintiffs' business and property in the millions of dollars, as set forth above and to be further established at trial;

H.     Awarding damages based on Defendants' misrepresentations and nondisclosures regarding the existence of benefits for these hospital services based on promissory estoppel, including any exemplary damages permitted by law;

I.     Awarding restitution for payments improperly withheld by Defendants;

J.     Declaring that Defendants have violated the terms of the relevant Plans and/or policies of insurance covering the Defendants' Subscribers;

K.     Requiring Defendants to make full payment on all previously denied charges for services during the Claim Period relating to the Defendants' Subscribers;

L.     Requiring Defendants to pay the CarePoint Hospitals the benefit amounts as required under the Plans;

M.     Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, or equity, including 29 U.S.C. § 1132(g);

N.     Awarding costs of suit;

O.     Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity; and

P.      Awarding all other relief to which Plaintiffs are entitled.

Respectfully submitted,

**K&L GATES, LLP**

By: /s/ Anthony P. La Rocco
     Anthony P. La Rocco
     anthony.larocco@klgates.com
     One Newark Center, 10th Floor
     Newark, New Jersey 07102
     (973) 848.4104  Telephone
     (973) 556.1584 Facsimile

***Attorneys for Plaintiffs***
Hudson Hospital OPCO, LLC, d/b/a
CarePoint Health—Christ Hospital; IJKG,
LLC, IJKG PROPCO LLC and IJKG OPCO
LLC, d/b/a CarePoint Health—Bayonne
Medical Center; and HUMC OPCO LLC,
d/b/a CarePoint Health—Hoboken
University Medical Center

Dated:  June 30, 2022